**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | :: | |
| | :: | **CRIMINAL ACTION FILE** |
| **v.** | :: | |
| | :: | **NO. 1:16-CR-006-11-ELR-AJB** |
| **GREGORY LANDON SMITH,** | :: | |
| | :: | |
| **Defendant.** | :: | |

**UNITED STATES MAGISTRATE JUDGE'S**
**FINAL REPORT AND RECOMMENDATION**

Gregory Landon Smith ("Smith" or "Defendant") moves to suppress the fruits of a traffic stop and the search of the Ford Explorer he was driving on April 15, 2015, that resulted in the seizure of a small quantity of methamphetamine in an Altoids can and approximately one pound of methamphetamine in a glove inside a cooler under the back seat. [Doc. 237]. The Court held two separate evidentiary hearings, [Doc. 351 (hereinafter "T_"), Doc. 400 (hereinafter "2T_")], after which the parties filed briefs. (Govt. [Docs. 437, 461]; Smith [Doc. 456]). After consideration of the evidence and the arguments of the parties, the undersigned **RECOMMENDS** that the motion to suppress, [Doc. 237], be **DENIED**.

*Facts*

The evidentiary record establishes the following facts.  On April 15, 2015, in the late afternoon, FBI Task Force Officer ("TFO") William Fay[1] and other law enforcement officers were performing surveillance of Olga Ramirez, who the officers believed was a methamphetamine distributor.  T6-7.  The basis of their belief was a series of drug purchases from Ramirez by an FBI confidential informant ("CI") during several months preceding the April 15 surveillance.  First, on August 28, 2014, at the Pat Mell Shopping Center in Smyrna, Georgia, the CI purchased an ounce of methamphetamine from Ramirez, who was driving her black Lexus IS 250; the CI bought the methamphetamine while sitting in the front seat of Ramirez's vehicle.  T14-15, 29.  Second, on March 4, 2015, Ramirez arrived at the same shopping center in a Buick Enclave and sold an ounce of methamphetamine to the CI after the CI entered the passenger side of her vehicle.  T15-16, 17, 29.  Third, on March 10, 2015, the CI met Ramirez in her Lexus at the Pat Mell Shopping Center.  This time, after the CI entered Ramirez's vehicle, they left the Pat Mell Shopping Center and traveled to the next shopping center, where Ramirez sold methamphetamine to the CI, and then

_____

[1]     Fay was a Clayton County, Georgia, Police Department patrolman for four years.  T6.  As an FBI TFO since September 2014, he was assigned to the narcotics division.  T7, 19.

2

they returned to the Pat Mell Shopping Center.  T17-18.  Finally, on April 2, 2015, the CI again purchased methamphetamine from Ramirez at the Pat Mell Shopping Center after getting into the passenger side of her black Lexus; the transaction took less than one minute.   T18.  The March 10 and April 2 transactions involved pound quantities of methamphetamine.  T29.  All of the transactions occurred very quickly.  T18.

On April 15, Ramirez was seen leaving her apartment in her black Lexus, picking up a friend at a nearby by apartment complex and going to CarMax before she arrived at the Pat Mell Shopping Center at about 7:45 p.m.  T7-8.  Various law enforcement officers maintained surveillance and radioed their observations to one another.  T10, 11. After parking in a parking spot in front of the Tortas Locas restaurant, Ramirez was seen going into the restaurant for a few minutes before she exited the restaurant and reentered her vehicle.  T8-9.  She then moved her car five or six spots to a parking spot directly next to a white Hyundai Accent (sometimes referred to in the record as a Hyundai Elantra).  T9-10, 21-22.  An Hispanic male carrying a brown paper bag exited the Accent and got into Ramirez's vehicle for less than one minute, and when he left, his hands were empty.  T10-11.  Ramirez then moved her vehicle again to a parking spot next to a green Ford Explorer.  T11.  During the investigation of Ramirez, law enforcement had not previously seen the Explorer.  T22.  A male exited the passenger

3

side of the Explorer and got into Ramirez's Lexus for less than a minute.  Once the male exited the Lexus and reentered to the Explorer, Ramirez drove back to where the Accent was parked.  T11.  A male then got out of the Accent and approached the Lexus's driver's side window, where it appeared to the surveilling agents that Ramirez handed currency to the male.  T12, 22.  After the male reentered the Accent, the three vehicles began to leave.  T12.  Fay did not observe any interaction between the occupants of the Accent and the Explorer, T20, nor did law enforcement see any actual exchange between Ramirez and passenger from the Explorer.  T22.

Nonetheless, the agents concluded that they had just witnessed a drug transaction, and Fay chose to follow the Explorer.  T12.  Another law enforcement agent called Cobb County police in order to arrange for the Explorer to be stopped, but since the Explorer was leaving Cobb County and entering Paulding County, Fay contacted Paulding County's dispatch, advised it that he was an FBI task force officer conducting a drug investigation and that he needed the Ford Explorer stopped.  He relayed to dispatch the make, model, color, and license plate of the vehicle. T12-13, 23.  Fay explained that he wanted the Explorer pulled over based on probable cause of an independent traffic violation, not the underlying drug investigation.  T25-26.  Fay also

4

notified local law enforcement that he wanted a drug-detecting dog to come to the scene of the eventual stop.  T110.

Ten to fifteen minutes after Paulding County was first contacted, at approximately 9:00 p.m., Paulding County Deputy Sheriff Whitley pulled the Explorer over for the purported traffic violation of following too closely in violation of O.C.G.A. § 40-6-9.  T25, 35, 64.[2]  Once the Explorer stopped, Whitley asked the driver (Smith) and passenger (codefendant Robert Lynn White) for their identification/driver's licenses, which they provided.  T36, 51; 2T134.

Paulding County Deputy Sheriff Callihan arrived on the scene of Whitley's traffic stop thirty seconds to one minute after Whitley had conducted the stop, and she spoke with the passenger and the driver through the passenger-side window. T69-70, 80.  Fellow Paulding County Deputy Sheriff Mixon arrived at about the same time as Callihan.  T81.  Whitley provided the identification documents to Mixon to check.  T36, 39.

The occupants of the Explorer denied consent to allow law enforcement to search the Explorer.  T93-94, 111.  The officers asked both occupants to get out of the vehicle

---

[2]     The Government does not rely on the traffic stop as a basis for lawfully stopping the Explorer, T96-97, and, as a result, the Court will not discuss the propriety of the traffic stop for violation of state traffic laws.

5

until the K-9 unit could arrive.  T70, 74, 92.  They were not restrained by handcuffs.
T76.  Deputies patted down both the driver (Smith) and passenger (White) and found
a wallet on one of them, but Callihan could not remember whose wallet it was.  T93.
Callihan asked them about their itinerary, and they stated that they were coming from
Smyrna; that they had gone out there for the purpose of going to a sex store and to look
for a car; and that they were going to Rome, Georgia.  T71, 85.

Approximately   ten   minutes   after   the   Explorer   had   been   stopped,
Corporal James Garmon of the Dallas (Georgia) Police Department and Thor, his
certified narcotics and apprehension K9, arrived.  T72-75, 100; Govt. Exs. 1 (Garmon
appearing at approximately 9:10 p.m. on Callihan's dash cam), 4 (Thor's certification
records).  Garmon and Thor had been accredited through the North American Police
Work  Dog  Association  as  a  Police  K9  team  to  detect  narcotics  including
methamphetamine.  T122; Govt. Ex. 4.  Garmon asked Smith if he consented to a
search of the Explorer, which consent was refused.  T111.  After explaining to Smith
what Thor was about to do, at approximately 9:14 p.m., Garmon ran Thor around the
vehicle, and Thor alerted to the front passenger door.  T111.  Garmon placed Thor back
in his vehicle and then Garmon searched the Explorer.  In the front passenger's seat in
between the center console and the seat, Garmon discovered a small Altoids can

6

containing an amount of suspected methamphetamine.  T112; 2T133.  Smith and White

were placed in custody.  T115-16.  A deputy sheriff located approximately one pound

of  methamphetamine under the second row of seats in the Explorer, in a glove inside

of a cooler.  T112; 2T134-36.

### Arguments of the Parties

The Government argues that probable cause existed to stop and search the

Explorer as a result of the officers' knowledge of the prior drug transactions between

Ramirez and the CI and their observations of Ramirez's actions on April 15, 2015, in

connection with the Accent and the Explorer.  It contends that law enforcement,

through a CI, had purchased methamphetamine from Ramirez four times, in quick

transactions occurring in the front seat of her vehicle in two Smyrna shopping center

parking lots, including three times at the Pat Mell Shopping Center.  The Government

goes on to point out that on April 15, law enforcement observed Ramirez arrive in her

black Lexus, identical to what they observed her do in all but one of the prior controlled

drug buys; White got into the front seat of her vehicle, just as the CI had done on the

previous occasions; and the transaction occurred very quicky, just like all of the

others.  [Doc. 437 at 9].  The Government submits that the differences between the

earlier transactions and the April 15 observations—in the earlier transactions,

Ramirez's source of supply was not observed, nor was an exchange of money witnessed—actually strengthens law enforcement's belief that a drug deal had just occurred on this latter occasion. [*Id.* at 10]. It also argues that it is irrelevant that the officers directed the local police to develop their own probable cause to make the traffic stop, or that they subjectively did not believe that they had probable cause to stop and search the Explorer, because subjective intentions are ignored when inquiring into the constitutionality of a search and seizure. [*Id.* at 11-12 (citations omitted)]. The Government further argues that because the officers had probable cause to believe that there was methamphetamine in the Explorer, pursuant to the automobile exception to the Fourth Amendment's warrant requirement, they were authorized to search it without a warrant. [*Id.* at 12 (citations omitted)].

Alternatively, the Government argues that law enforcement had reasonable suspicion based on the prior Ramirez-CI drug deals and the April 15 events to conduct a *Terry*[3] stop, which was properly limited in duration in that the K9 arrived only ten minutes after the traffic stop. [*Id.* at 12-19]. The Government then argues that reasonable suspicion ripened into probable cause to search the vehicle after Thor alerted to the presence of narcotics. [*Id.* at 19-21].

---

[3]        *Terry v. Ohio*, 392 U.S. 1 (1968).

8

Smith counters that the earlier Ramirez-CI transactions were different from each other and different from what the police observed on April 15. [Doc. 458 at 2]. As to the August 28, 2014, meeting, he cites to a memorandum of the CI's debriefing following the transaction. He claims that it is unclear whether law enforcement witnessed the transaction. [*Id.*]. In the memorandum, [Doc. 456-1], the CI related that he/she asked Ramirez whether the transaction should be done inside or outside the vehicle, and Ramirez invited the CI into her vehicle, where the CI was given a T-Mobile shopping bag containing methamphetamine and an empty cell phone box. [Doc. 456 at 2 (citing [Doc. 456-1])]. Smith contends that there is no indication how long the CI remained in the Lexus or what time of day the transaction took place, but surmises that the CI left the Lexus with the T-Mobile bag. [*Id.*].

He next discusses the March 4, 2015, transaction, noting that it occurred almost seven months after the earlier transaction. [*Id.* at 3 (citing [Doc. 456-2]). That time, police reported that at 2:14 p.m. the CI arrived first at the Pat Mell Shopping Center, followed approximately ten minutes later by a red Buick Enclave, which parked in front of the Tortas Locas restaurant. The report noted that the CI entered the Enclave, which was driven by Ramirez, and then the Enclave was driven to a different parking spot in

9

front of a bakery.  After one minute, the CI exited the vehicle with narcotics in a plastic bag, which Smith presumes the CI carried outside of the vehicle.  [*Id.*].

As for the March 10, 2015, transaction, Smith notes that the CI was dropped off in front of the Tortas Locas restaurant at 2:10 p.m., and fourteen minutes later, the CI entered the black Lexus that was parked at the far right of the shopping center.  Two minutes later, the Lexus left the shopping center lot, returning seven minutes later after going to another shopping center.  The methamphetamine acquired by the CI was stored in a Tupperware container that, presumably, the CI carried outside of the Lexus.  [*Id.* (citing [Doc. 456-4])].

As for the April 2, 2015, deal, Smith notes that the CI was dropped off at the Pat Mell Shopping Center at 10:50 a.m., Ramirez arrived in the Lexus at 10:59 a.m., and after the CI got in the Lexus, he/she exited with a package.  [*Id.* at 3-4 (citing [Doc. 456-5])].

In contrast, Smith recounts the surveillance reports for April 15, specifically noting that nothing was observed in White's hands after he left the Lexus.  [*Id.* at 4 (citing Doc. 456-5])].

Smith then highlights some of the differences between the previous known drug transactions by Ramirez and the April 15 observations by law enforcement in an effort

10

to demonstrate that his vehicle was not lawfully stopped.  He contends that the Government has supplied no information as to who picked the location(s) of the four Ramirez-CI meetings, [Doc. 456 at 4]; he contends that the first Ramirez-CI interaction was not surveilled, [*id.* at 4-5]; the Ramirez-CI meetings occurred early in the day while the April 15 transaction was later in the afternoon/early evening, [*id.* at 5]; and on two occasions, the FBI dropped off the CI to conduct the drug transactions with Ramirez.  [*Id.*].  He points out that the record is silent as to why the FBI was surveilling Ramirez on April 15.  [*Id.*].  Unlike the other transactions, there was another vehicle involved on April 15, and there were two people in the Explorer.  [*Id.*].  He denigrates the Government's theory that at least one of the persons in the Accent was Ramirez's source of supply.  [*Id.* at 6 n.2].  He also contends that Ramirez ran errands before meeting with White but came directly from her residence in dealing with the CI.  Further, he submits that despite the use of Title III wire intercepts in this case, the Government introduced no evidence to indicate that a drug transaction was to take place on that date.  [*Id.* at 5, 6].  Thus, he argues that the interaction between Ramirez and Smith was different than those between Ramirez and the CI, and law enforcement observations on April 15 amounted to no more than bare suspicions, assumptions, and a hunch, which are not sufficient to justify stopping the Explorer.  [*Id.* at 6].

11

He next argues that the Government must have concluded that a drug deal had occurred because drugs ultimately were located in the vehicle, but he argues that what ultimately was located cannot be used to support a finding of probable cause.  [*Id.*]. Somewhat inconsistently, he then argues that the methamphetamine was, in part, located in a cooler under the back seat, but that despite the almost forty-five minutes of surveillance, there is no evidence that law enforcement observed any activity in the backseat of the Explorer, "so it is arguable that the located methamphetamine did not come from [ ] White's interactions with [ ] Ramirez . . . ."  [*Id.* at 6-7].  He then argues that there is no evidence of a drug transaction between the Explorer and the Lexus and that instead, "it appears that the delivery of and payment for the drugs took place only between the occupant(s) of the Lexus and Hyundai."  [*Id.* at 7].

Smith then goes on to contrast the facts of this case to those of *United States v. Wingfield*, 646 Fed. Appx. 728, 732 (11th Cir. Mar. 22, 2016), where the Eleventh Circuit held that reasonable suspicion existed to stop a truck in which defendant was passenger, based upon (1) the officer seeing the truck moving slowly down street at 2:00 a.m. in a high-crime and high-drug area; (2) the truck was stopped on side of road with the defendant standing beside it; (3) the defendant jumped into the truck after seeing the officer; (4) the truck drove off quickly, taking a circuitous route, and failed

12

to stop immediately when the officer activated his lights.  [Doc. 457 at 7].  He also argues that even had reasonable suspicion existed in the present case, probable cause was required.  [*Id.*].  He submits that *United States v. Valerio*, 718 F.3d 1321, 1324 (11th Cir. 2013), limits a *Terry* investigative stop to situations where officers are required to take " 'swift action predicated upon the on-the-spot observations of the officer on the beat,' " and not as an end-run around the warrant requirement.  [Doc. 456 at 8 (citations omitted)].  He argues that because the Explorer was followed for forty-five minutes, the officers were not in a hurry and could have tracked it to its final location and obtained a warrant.  [*Id.*].

In reply, the Government argues that the Explorer was properly stopped based on reasonable suspicion and probable cause.  [Doc. 461 at 1].  It first argues that since Smith did not challenge the applicability of the automobile exception, the propriety of the dog sniff, or the scope of the *Terry* stop, he abandoned those arguments. [*Id.* (citations omitted)].  It then argues that probable cause existed because the officers knew that Ramirez was a drug dealer since they had bought drugs from her four times in the past year at the Pat Mell Shopping Center; each transaction lasted only a short time; and each transaction occurred in Ramirez's vehicle, usually the black Lexus. It argues that the April 15 transaction occurred the same way as the prior deals, except

13

that this time they also saw her obtain drugs from her source and pay for them.  [Doc. 461 at 2].

The Government also objects to Smith's use of the surveillance reports, [Docs. 456-1 to -4], as outside of the evidentiary record, contending that Smith chose not to cross-examine witnesses at the hearing about these reports and citing to cases in which post-hearing exhibits were not relied upon.  [*Id.* (citations omitted)].  Even if the reports are considered, the Government argues that it never contended that the other transactions were identical to the April 15 transaction; that the differences cited are superficial; and that, in any event, the dissimilarities do not detract from the presence of probable cause.  [*Id.* at 3-4].

Next, the Government denies that it is relying on the fact that drugs ultimately were discovered, and it instead claims that it is relying upon Fay's testimony that he observed Ramirez and White engage in a drug deal based upon the previous transactions involving Ramirez and the CI, her exchange of the paper bag with an unknown male, Ramirez's payment of money to the person in the Accent, and the witnessed interactions with White and the Explorer.  [*Id.* at 4].

The Government also contends that Smith's argument that the stop was not a valid *Terry* stop is contrary to law and Fay's testimony.  Arguing that *Terry* stops come

14

into play when swift action is necessary based upon on-the-spot observations by police, it argues that *Valerio* is inapposite because in that case, the police waited one week to stop the defendant.  [*Id.* at 5 (citing *Valerio*, 718 F.3d at 1324-25)].  It contends that the officers in the present case did everything they could to stop the vehicle expeditiously. It points out that the agents first called Cobb County police, but the Explorer was leaving Cobb County, and so they called Paulding County, whose officers stopped the Explorer between ten and fifteen minutes after receiving the dispatch, thus distinguishing this case from *Valerio*.  [*Id.* at 5-6].

### Discussion

The Court rejects Smith's challenges to the traffic stop and search of his vehicle, and concludes that, at a minimum, law enforcement officers had reasonable suspicion to stop his Explorer based on their observations that evening at the Pat Mell Shopping Center, in light of Ramirez's previous drug deals at that same location.  Then, reasonable suspicion to conduct a limited investigatory stop ripened into probable cause to search the Explorer based upon Thor's positive alert for narcotics, justifying the warrantless search of the Explorer pursuant to the so-called automobile exception to the Fourth Amendment's warrant requirement.

15

AO 72A
(Rev.8/8
2)

As an initial matter, the Court does not consider the exhibits that Smith attached to his post-evidentiary hearing brief.   These documents presumably were in Defendant's possession at the time of the evidentiary hearings and could have been used to cross-examine the witnesses.  Smith does not proffer why he could not have utilized these materials at the evidentiary hearing.   Although authored by law enforcement agents, the submission and consideration of these documents at this time would be without affording the Government the opportunity to further examine the authors.  In any event, even if the Court did consider the exhibits, the Court still would recommend that Smith's motion to suppress be denied.

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures.  U.S. Const. amend. IV. "In most circumstances, for a search that is not based on consent to comply with the Fourth Amendment, law enforcement must obtain a warrant supported by probable cause."  *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005).  Evidence obtained in violation of the Fourth Amendment must be suppressed.  *United States v. Gilbert*, 942 F.2d 1537, 1541 (11th Cir. 1991). Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution.  *United States v. Freire*,

16

710 F.2d 1515, 1519 (11th Cir. 1983) (citing *United States v. Impson,* 482 F.2d 197 (5th Cir. 1973)); *see also United States v. Knight*, 336 Fed. Appx. 900, 904 (11th Cir. July 8, 2009).  Thus, the Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment.  *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Freire*, *supra*.

A so-called "*Terry* stop" is one such narrow exception.  *See Terry v. Ohio*, 392 U.S. 1 (1968).  *Terry*, and the cases which have followed it, make clear that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000); *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000).  Under *Terry*, police officers may make an investigative stop if the circumstances are sufficient to enable them reasonably to suspect that an individual is engaged in criminal activity.  *United States v. Cortez*, 449 U.S. 411, 417-22 (1981); *Terry*, 392 U.S. at 21.  Probable cause is not required to justify an investigative stop; reasonable suspicion is sufficient. *United States v. Powell*, 222 F.3d 913, 917-18 (11th Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 474-75

17

AO 72A
(Rev.8/8
2)

(11th Cir. 1996).  Specifically, "officers need only 'reasonable suspicion'—that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) (quoting *Navarette v. California*, 134 S. Ct. 1683, 1687-88 (2014) (internal quotation marks omitted)); *see also United States v. Dipirro*, 649 Fed. Appx. 930, 931 n.1 (11th Cir. May 18, 2016) ("Though Defendant only references probable cause, we note that a traffic stop is 'constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with' *Terry* [ ].") (quoting *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008)) (citation omitted).

"Reasonable suspicion consists of 'a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable.' " *United States v. Yuknavich*, 419 F.3d 1302, 1311 (11th Cir. 2005) (quoting *United States v. Knights*, 534 U.S. 112, 121 (2001)).  "The reasonable suspicion standard requires less than probable cause and 'considerably less' than a preponderance of the evidence." *Navarette*, 134 S. Ct. at 1687 (quotation omitted); *United States v. Mendoza*, No. 15-13953, 2016 WL 4191130, at *2 (11th Cir. Aug. 9, 2016).  To make a showing that in fact the officers had reasonable

18

suspicion, they "must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" of criminal activity.' " *Wardlow,* 528 U.S. at 123-24 (quoting *Terry*, 392 U.S. at 27). Thus, the "detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 417-18. That is, the officers or agents involved in the challenged law enforcement activity must "articulate some minimal, objective justification" for an investigatory stop. *United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989), and *United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir. 1989)); *see also Yuknavich*, 419 F.3d at 1311 ("It is clear that an inchoate and unparticularized suspicion or hunch of criminal activity is not enough to satisfy the minimum level of objectivity required.") (citing *United States v. Perkins*, 348 F.3d 965, 970 (11th Cir. 2003)). "The officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* (internal citations and quotations omitted). To determine whether reasonable suspicion exists, courts evaluate the totality of the circumstances from the viewpoint of a reasonably well-trained officer, *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000), taking into account the fact that an experienced officer can infer criminal activity from conduct that may seem innocuous

19

to lay observers.  *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002); *United States v. Matchett*, 802 F.3d 1185, 1191 (11th Cir. 2015) (noting that courts view the totality of the circumstances in the light of the officer's special training and experience because "behavior, seemingly innocuous to the ordinary citizen, may 'appear suspect to one familiar with [criminal] practices' ") (quoting *Smith*, 201 F.3d at 1323, and *United States v. Glover*, 957 F.2d 1004, 1010 (2d Cir. 1992)) (punctuation altered). Reasonable suspicion should be examined from the standpoint of the collective knowledge of all officers involved in a stop, *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998), provided the officers maintained at least a minimal level of communication during their investigation, *United States v. Burrows*, 566 Fed. Appx. 889, 892 (11th Cir. May 21, 2014); *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985).  Moreover, the "officer's motive . . . does not invalidate what is otherwise 'objectively justifiable behavior under the Fourth Amendment[.]' "  *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999) (quoting *Whren v. United States*, 517 U.S. 806, 812 (1996)).

In this case, on four prior occasions, law enforcement officers witnessed Ramirez sell methamphetamine to their CI at the Pat Mell Shopping Center or an adjoining center.  On April 15, 2015, the officers witnessed Ramirez engage in conduct very

AO 72A
(Rev.8/8
2)

similar to the actions she took when she previously sold narcotics to the CI. She arrived at the Pat Mell Shopping Center in her black Lexus. She moved the vehicle several parking spots nearer to the Accent, where a man from the Accent carrying a package consistent with one containing narcotics got into her front seat for a very short period of time and then exited the Lexus without appearing to carry the aforementioned bag. Ramirez then drove her vehicle closer to a parking spot next to the Explorer, where the passenger exited the Explorer, entered the Lexus for a very short period of time, and reentered the Explorer. Ramirez then drove back to the Accent, where she was observed handing currency to one of the Accent's occupants. To an experienced narcotics officer, what was observed was consistent with a transfer of narcotics from Ramirez's source of supply to Ramirez and then to the Explorer's passenger, followed by Ramirez then paying her source of supply for the narcotics. The minimal differences between each of the previous transactions and the April 15 transaction are indeed superficial and do not detract from the fact that Ramirez sold methamphetamine on multiple occasions to the CI at the Pat Mell Shopping Center, and the April 15 transaction between Ramirez, the Accent, and the Explorer appeared to the surveilling officers to fit the pattern of her previous encounters. *See United States v. Gonzalez*, 70 F.3d 1236, 1238 (11th Cir. 1995) (recognizing that facts giving rise to reasonable

suspicion "may be derived from 'various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers.' ") (quoting *Williams*, 876 F.2d at 1524, and *Cortez*, 449 U.S. at 418).   Moreover, the fact that the Government did not introduce more evidence, such as Title III intercepts or an explanation as to how law enforcement came to be surveilling Ramirez on April 15, does not devalue the existence of reasonable suspicion based upon the articulated facts presented.   Accordingly, law enforcement had reasonable suspicion to stop the Explorer.

The Court also rejects Smith's arguments that a warrant was needed to stop and search the Explorer.   First, a warrant was not needed to stop the Explorer because an investigatory traffic stop based on reasonable suspicion is not a search.   *Mikell*, 102 F.3d at 474 ("Even in the absence of probable cause, the police may stop a car and briefly detain it and its occupants in order to investigate a reasonable suspicion that such persons are involved in criminal activity.") (citing *Terry*, 392 U.S. at 21; *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990)); *see also United States v. Sharpe*, 470 U.S. 675, 682 (1985) (applying *Terry* analysis to vehicle stop).

Second, Smith's reliance on *Valerio* is misplaced.   In that case, a DEA agent witnessed Valerio shopping at a hydroponics store and surmised, based on the

AO 72A
(Rev.8/8
2)

circumstances, that Valerio likely was growing marijuana. *Valerio*, 718 F.3d at 1322. On Valerio's second visit to the store, DEA agents followed him to a warehouse suitable for growing marijuana. *Id.* DEA agents failed to observe any suspicious or criminal activity during one week of surveillance over Valerio. *Id.* at 1322-23. A narcotics dog sniffed parts of the warehouse, but only alerted to bays rented by people other than Valerio. *Id.* The police subsequently conducted a "voluntary citizen encounter" with Valerio by blocking his vehicle in the driveway, approaching his car with guns drawn, and performing a pat down search before questioning him about the warehouse. *Id.* at 1323. Valerio then admitted to growing marijuana in the warehouse. *Id.* The Eleventh Circuit reversed the district court's denial of Valerio's motion to suppress evidence that led to his arrest. *Id.* at 1325. The one-week delay between the agents' observations of Valerio and his arrest "and the complete absence of any contemporaneous observations of Mr. Valerio that would necessitate 'swift' law enforcement action . . . made it entirely practicable for law enforcement officers to proceed with their investigation in a manner consistent with the default requirements of the Fourth Amendment." *Id.* at 1325. Contrary to *Valerio*, police in this case had just witnessed the Explorer's occupants engage in what appeared to be a drug deal, considering that what they observed was so similar to Ramirez's known drug deals at

23

the Pat Mell Shopping Center, combined with their added observations of the male from the Accent carrying and leaving a brown paper bag in the Lexus and then Ramirez paying money to the Accent's occupants. The Explorer then left the shopping center and soon crossed the county line to unknown whereabouts. This situation is exactly the type of swift action based upon on-the-spot observations by law enforcement that *Terry* permits.[4]

Therefore, since a warrant was not required, the Court analyzes a *Terry* stop—an exception to the warrant requirement—for its reasonableness; i.e., "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. As noted above, the Explorer was properly stopped because the officers had articulable reasonable suspicion that the occupants had just engaged in a drug deal at the Pat Mell Shopping Center. To be reasonable, a *Terry* stop must last "no longer

---

[4]        The Court also concludes that there were more facts supportive of reasonable suspicion in this case than in *Wingfield*. In the present case, the officers knew from the CI's four prior drug purchases that Ramirez distributed narcotics from the front seat of her vehicle(s) at the Pat Mell Shopping Center, and the events that the officers witnessed on April 15 involving the Lexus, Explorer, and Accent were consistent with these previous incidents. In *Wingfield*, the officer had no prior information about the defendant or the driver of the truck with which Wingfield was interacting. *Wingfield*, 646 Fed. Appx. at 729-30.

AO 72A
(Rev.8/8
2)

than is necessary to effectuate the purpose of the stop," and "the scope of the detention must be carefully tailored to its underlying justification." *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999) (quotations and alteration omitted).  Because a traffic stop " 'is more analogous to an investigative detention than a custodial arrest . . . [the Court] analyze[s] the legality of these stops under the standard articulated in *Terry* . . . .' "   *United States v. Gonzalez*, 275 Fed. Appx. 930, 932 (11th Cir. May 2, 2008) (quoting *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (citations omitted)).  Accordingly, " 'an officer's actions during a traffic stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place.' "   *Id.* (quoting *Purcell*, *id.*, and *Terry*, 392 U.S. at 20).

The use of a drug-detecting dog to sniff for narcotics is a legitimate investigative technique following a traffic stop supported by reasonable suspicion that the vehicle's occupants were involved in drug trafficking.   *See United States v. Place*, 462 U.S. 696, 707 (1983) (holding that the use of a drug-sniffing dog as an acceptable investigation technique that can be performed in a minimally intrusive manner); *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988) (concluding that detention during a canine sniff "is the kind of brief, minimally intrusive investigation technique

25

that may justify a *Terry* stop").  Moreover, the ten minutes between the time of the traffic stop and the arrival of Garmon and Thor "represents a time frame that falls within the ambit of 'the time necessary to effectuate the purpose of the stop.' " *United States v. Stilling*, 346 Fed. Appx. 458, 460 (11th Cir. Sept. 24, 2009) (quoting *Purcell*, 236 F.3d at 1277).  Therefore, the detention following the stop was reasonable.

Once a trained canine gives a positive alert to a vehicle, probable cause exists to search that vehicle.  *United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006) ("We have long recognized that probable cause arises when a drug-trained canine alerts to drugs." (internal quotation marks omitted));  *Glinton*, 154 F.3d at 1257; *see also United States v. Burrows*, 564 Fed. Appx. 486, 492 (11th Cir. May 1, 2014) ("[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." (quoting *Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013)).  The evidence demonstrates, and Smith makes no contrary contention, that Thor was properly certified and trained, and thus his positive alert for narcotics gave rise to probable cause to believe that the Explorer contained contraband.

AO 72A
(Rev.8/8
2)

Then, under the so-called automobile exception[5] to the Fourth Amendment's preference for warrants, the police can conduct a warrantless search of a vehicle "if (1) the vehicle is readily mobile; and (2) the police have probable cause for the search." *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007). "The requirement of mobility is satisfied merely if the automobile is operational." *Id.* (internal quotation marks omitted). In searching the vehicle, law enforcement is permitted to "search all parts of the vehicle, and any containers therein, where the object of the search might be found." *United States v. Baldwin*, 774 F.3d 711, 720 (11th Cir. 2014). Thus, the police in this case were permitted to search the passenger compartment of the Explorer, including the Altoids can and the cooler containing the glove-wrapped methamphetamine, since both were places in which drugs may be found. *United States v. Reeves*, 604 Fed. Appx. 823, 827 (11th Cir. Mar. 18, 2015) (quoting *United States v.*

---

[5]      The term "automobile exception" is somewhat of a misnomer, since the Supreme Court has expressly stated that there is "no general 'automobile exception' to the warrant requirement." *South Dakota v. Opperman*, 428 U.S. 364, 382 (1976). Rather, this term of art is better understood as simply embracing the now-settled doctrine that it is permissible to conduct a warrantless search of an automobile, and any containers found therein, provided that, at the time of the search, there is probable cause to believe that contraband is secreted at some unspecified location within the automobile. *California v. Acevedo*, 500 U.S. 565 (1992); *United States v. Ross*, 456 U.S. 798 (1982). Of course, if the police have probable cause to believe that contraband is located in a specific area of the automobile, then a warrantless search of the entire automobile is impermissible. *See Arkansas v. Sanders*, 442 U.S. 753 (1979).

27

*Ross*, 456 U.S. 798, 820-21 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.")).  Therefore, the methamphetamine was lawfully discovered inside the Explorer, and Smith is not entitled to have it excluded from his trial on Fourth Amendment grounds.

Accordingly, for all of the reasons stated above, the Explorer was lawfully stopped and searched, and therefore, the undersigned **RECOMMENDS** that Smith's motion to suppress evidence, [Doc. 237], be **DENIED**.

### Conclusion

The undersigned **RECOMMENDS** that Smith's motion to suppress evidence, [Doc. 237], be **DENIED**.  The Court has now ruled on all matters assigned to it and has not been advised of any impediments to the setting of a trial date.  Thus, this case is **CERTIFIED READY FOR TRIAL**.[6]

------

[6]    However, because matters pertaining to Smith's codefendants are still pending before the undersigned, it is not necessary to place Smith's case on a trial calendar at this time.  18 U.S.C. § 3161(h)(6).

28

AO 72A
(Rev.8/8
2)

**IT IS SO RECOMMENDED AND CERTIFIED**, this the  28th  day of December, 2016.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

29